**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| MICAH BITTLE, | No. 3:19-cv-01384 (KAD) |
| *Plaintiff*, | |
| v. | |
| ANDREW M. SAUL, COMMISSIONER OF SOCIAL SECURITY,[1] | July 23, 2020 |
| *Defendant*. | |

**MEMORANDUM OF DECISION RE: PLAINTIFF'S MOTION TO REVERSE**
**THE DECISION OF THE COMMISSIONER (ECF NO. 21) AND DEFENDANT'S**
**MOTION TO AFFIRM THE DECISION OF THE COMMISSIONER (ECF NO. 22)**

Kari A. Dooley, United States District Judge:

Micah Bittle (the "Plaintiff"), proceeding *pro se*, brings this administrative appeal pursuant to 42 U.S.C. § 405(g).  He appeals the decision of Defendant Andrew M. Saul, Commissioner of the Social Security Administration (the "Commissioner"), denying his application for disability insurance benefits ("DIB") pursuant to Title II of the Social Security Act (the "Act") and granting in part his application for supplemental security income benefits ("SSI") pursuant to Title XVI of the Act.  Plaintiff moves to reverse the Commissioner's partially favorable decision to the extent the Commissioner concluded that the Plaintiff was not disabled prior to January 1, 2016.  The Commissioner opposes the Plaintiff's claims of error and moves to affirm its decision.   For the reasons set forth below, the Plaintiff's motion to reverse is DENIED and the Commissioner's motion to affirm is GRANTED.

---

[1] The Clerk of the Court is requested to amend the caption in this case to conform to the above.

**Standard of Review**

A person is "disabled" under the Act if that person is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(a); 1382c(a)(3)(A). A physical or mental impairment is one "that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." *Id.* §§ 423(d)(3); 1382c(a)(3)(D). In addition, a claimant must establish that his "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ." *Id.* §§ 423(d)(2)(A); 1382c(a)(3)(B).

Pursuant to regulations promulgated by the Commissioner, a five-step sequential evaluation process is used to determine whether a claimant's condition meets the Act's definition of disability. *See* 20 C.F.R. § 404.1520. In brief, the five steps are as follows: (1) the Commissioner determines whether the claimant is currently engaged in substantial gainful activity; (2) if not, the Commissioner determines whether the claimant has "a severe medically determinable physical or mental impairment" or combination thereof that "must have lasted or must be expected to last for a continuous period of at least 12 months;" (3) if such a severe impairment is identified, the Commissioner next determines whether the medical evidence establishes that the claimant's impairment "meets or equals" an impairment listed in Appendix 1 of the regulations; (4) if the claimant does not establish the "meets or equals" requirement, the Commissioner must then determine the claimant's residual functional capacity ("RFC") to perform

2

his past relevant work; and (5) if the claimant is unable to perform his past work, the Commissioner must next determine whether there is other work in the national economy which the claimant can perform in light of his RFC and his education, age, and work experience. *Id.* §§ 404.1520(a)(4)(i)-(v); 404.1509. The claimant bears the burden of proof with respect to Step One through Step Four, while the Commissioner bears the burden of proof as to Step Five. *McIntyre v. Colvin*, 758 F.3d 146, 150 (2d Cir. 2014).

It is well-settled that a district court will reverse the decision of the Commissioner only when it is based upon legal error or when it is not supported by substantial evidence in the record. *See, e.g.*, *Greek v. Colvin*, 802 F.3d 370, 374–75 (2d Cir. 2015) (*per curiam*); *see also* 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive"). "Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012) (quotations marks and citation omitted). "In determining whether the agency's findings were supported by substantial evidence, the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn." *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (*per curiam*) (quotation marks and citation omitted). "Under this standard of review, absent an error of law, a court must uphold the Commissioner's decision if it is supported by substantial evidence, even if the court might have ruled differently." *Campbell v. Astrue*, 596 F. Supp. 2d 446, 448 (D. Conn. 2009). The court must therefore "defer to the Commissioner's resolution of conflicting evidence," *Cage v. Comm'r of Social Sec.*, 692 F.3d 118, 122 (2d Cir. 2012), and can only reject the Commissioner's findings of fact "if a reasonable factfinder would *have to conclude otherwise*," *Brault v. Social Sec. Admin.*, 683 F.3d 443, 448 (2d Cir. 2012) (*per*

*curiam*) (quotation marks and citation omitted).  Stated simply, "[i]f there is substantial evidence to support the [Commissioner's] determination, it must be upheld." *Selian*, 708 F.3d at 417.

**Procedural History**

In July 2012, Plaintiff filed applications for DIB and SSI pursuant to Title II and Title XVI of the Act, alleging an onset date of January 20, 2011. (*See* Tr. 107–118.)  The claims were initially denied on September 25, 2012 and a video hearing was thereafter conducted before Administrative Law Judge ("ALJ") Dennis O'Leary on March 5, 2014. (*See* Tr. 163.)  On April 22, 2014, ALJ O'Leary issued a written decision denying Plaintiff's application for DIB and SSI. (*See* Tr. 160–73.)  After the Appeals Council denied Plaintiff's request for review, Plaintiff appealed the decision to the United States District Court for the District of Connecticut.  On October 10, 2017, the District Court (Garfinkel, *M.J.*) granted the Commissioner's consent motion to reverse and remand the case for further development of the administrative record. (Tr. 123–24.)  The Appeals Council then vacated the Commissioner's decision and remanded the case to the ALJ to conduct a *de novo* hearing. (Tr. 121.)  Hearings were held before ALJ Matthew Kuperstein on August 7, 2018 (Tr. 42–81) and December 13, 2018 (Tr. 82–106), at which the Plaintiff appeared *pro se*.  On April 3, 2019 ALJ Kuperstein rendered a partially favorable decision in which he concluded that Plaintiff was disabled as of January 1, 2016 so as to entitle him to SSI as of that date, but he was not disabled prior to that date.

In his decision, ALJ Kuperstein followed the sequential evaluation process for assessing disability claims.  At Step One, the ALJ found that Plaintiff has not been engaged in substantial gainful activity since the alleged onset date of his disability. (Tr. 7.)  At Step Two, the ALJ determined that Plaintiff has severe medically determinable impairments consisting of narcolepsy with cataplexy, sleep disorder, and cluster headaches. (Tr. 7.)  The ALJ also concluded that

Plaintiff has non-severe impairments consisting of "spondylosis of the cervical spine and adjustment disorder with mixed anxiety and depression." (Tr. 7.)  The ALJ further noted that Plaintiff reportedly suffered from back pain but the ALJ did not find this to be a medically determinable impairment given the absence of corroborating clinical or laboratory diagnostic reports. (Tr. 8.)  At Step Three, the ALJ concluded that none of Plaintiff's severe impairments met or medically equaled a listed impairment in Subpart P, Appendix 1 at 20 C.F.R. Part 404. (Tr. 8.)  At Step Four, the ALJ determined that prior to January 1, 2016, Plaintiff had the RFC "to perform a full range of work at all exertional levels, but with the following exertional limitations: to work that has no hazard such as heights, machinery, or the operation of motor vehicles, and work that does not involve contact with the public." (Tr. 8.)  Beginning on January 1, 2016, the ALJ determined that Plaintiff's RFC included a further limitation requiring that he "be able to be off-task for 11% of the workday in addition to regularly scheduled work breaks on a regular basis." (Tr. 12.)  The ALJ concluded that as of January 1, 2016, Plaintiff would be unable to perform any of his past relevant work as a case aide, sales clerk, stock clerk, general clerk, or telephone solicitor. (Tr. 12–13.)  The ALJ found insufficient evidence to render a finding at Step Four as to whether Plaintiff could perform his past relevant work prior to that date. (Tr. 13.)  Nonetheless, the ALJ held at Step Five that jobs existed in significant numbers in the national economy that Plaintiff could have performed prior to January 1, 2016. (Tr. 13.)  After that date, however, the ALJ concluded that the additional nonexertional limitations cited above precluded Plaintiff from being able to perform any such jobs. (Tr. 14.)  ALJ Kuperstein accordingly deemed Plaintiff disabled as of January 1, 2016.

Plaintiff declined to file written exceptions to the ALJ's decision.  After the ALJ's decision became final, this appeal followed.

**Discussion**

In his motion to reverse, the Plaintiff challenges the ALJ's conclusion that Plaintiff's conditions and limitations were not severe enough to warrant a finding of disability prior to January 1, 2016.[2] Plaintiff argues that ALJ "Kuperstein did not take into consideration all documents present in my case, especially both sets of sleep studies . . . which were submitted as evidence." (Pl.'s Mem. at 2, ECF No. 21-1.) The Court construes Plaintiff's statements as challenges to the ALJ's formulation of the Plaintiff's RFC and will address whether the ALJ's conclusions at Step Four are supported by substantial evidence in the record—particularly as they bear on any functional limitations arising from the Plaintiff's narcolepsy with cataplexy.[3]

"Residual functional capacity ('RFC') is the most a claimant can do in a work setting despite her limitations." *Morales v. Colvin*, No. 3:16-CV-0003 (WIG), 2017 WL 462626, at *1 n.1 (D. Conn. Feb. 3, 2017). "When determining a claimant's RFC, the ALJ is required to take the claimant's reports of pain and other limitations into account, but is not required to accept the claimant's subjective complaints without question; he may exercise discretion in weighing the credibility of the claimant's testimony in light of the other evidence in the record." *Genier v.*

---

[2] With respect to the Plaintiff's DIB application, the Plaintiff would need to show that he was disabled prior to the date last insured to be entitled to benefits. *See, e.g.*, *Mauro v. Berryhill*, 270 F. Supp. 3d 754, 762 (S.D.N.Y. 2017), *aff'd sub nom. Mauro v. Comm'r of Soc. Sec. Admin.*, 746 Fed. Appx. 83 (2d Cir. 2019) ("[W]hen a claimant does not show that a currently existing condition rendered her disabled prior to her date last insured, benefits must be denied."). Here, Plaintiff's date last insured was March 31, 2012. (*See* Tr. 7.) In his motion Plaintiff does not distinguish between the eligibility requirements for DIB and SSI. Because the Court concludes that the ALJ's determination that Plaintiff was not disabled prior to January 1, 2016 is supported by substantial evidence, the Court need not address whether he was disabled before the date last insured for purposes of DIB.

[3] The Plaintiff also takes issue with certain aspects of ALJ O'Leary's 2014 decision, including what he characterizes as a "personal attack made out to me in O'Leary's denial, as his offensive statements in regards to my sporadic work history, my educational achievements, and mental capacity, made it clear that he likely did not consider any of the documents presented to him in regards to my case." (Pl.'s Mem. at 2.) This Court's jurisdiction is confined to reviewing "any final decision of the Commissioner of Social Security." 42 U.S.C. § 405(g). Because the Appeals Council vacated ALJ O'Leary's decision upon remand from the District Court, it no longer constitutes a final decision from which the Plaintiff can seek review. *See, e.g.*, *Iwachiw v. Massanari*, 125 Fed. Appx. 330, 331 (2d Cir. 2005) (summary order) (finding the absence of a final appealable decision where "the Appeals Council vacated the ALJ's decision denying [plaintiff's] benefits claim and remanded the case for further proceedings"). Therefore, the only decision before the Court is ALJ Kuperstein's decision. (*See* Tr. 2.)

*Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (*per curiam*) (internal citations omitted); *see also Salerno v. Berryhill*, No. 19-CV-00627 (KHP), 2020 WL 882006, at *10 (S.D.N.Y. Feb. 24, 2020) ("The ALJ must weigh all the available evidence available to make an RFC finding consistent with the record as a whole and may resolve disputes between conflicting evidence").  "An ALJ's RFC assessment should be proper, not internally inconsistent, and supported by substantial evidence." *Payamps v. Berryhill*, No. 3:17-CV-2008 (WIG), 2019 WL 259114, at *3 (D. Conn. Jan. 18, 2019) (quotation marks and citation omitted).

While the ALJ found that Plaintiff's "medically determinable impairments could reasonably be expected to cause [his] alleged symptoms," the ALJ concluded that Plaintiff's "statements about the intensity, persistence, and functionally limiting effects of his symptoms are not supported by the objective medical evidence in the records, prior to January 1, 2016." (Tr. 9–10.)  The ALJ noted that while Plaintiff reported suffering from narcolepsy since he was a teenager, he continued to engage in regular work activity until his company disbanded in 2011, at which point the Plaintiff was 40 years old.  (Tr. 10.)  In September 2012, Plaintiff underwent a consultative examination, at which time he was not taking any medications for his narcolepsy.  (Tr. 10.)  The ALJ observed that Plaintiff was diagnosed with probable narcolepsy following a Multi-Sleep Latency Test ("MSLT") in November 2012.  (Tr. 10.)  In the period that followed, from 2013 through 2015, the ALJ noted that Plaintiff complained of cataplexy but medical records during this time period reflect that he was doing well with his medication regimen and was mostly functioning during the daytime.  (Tr. 10.)  The ALJ further noted that Plaintiff's "treatment notes from November 30, 2012, when he was diagnosed with narcolepsy, through the end of 2015, reflect the claimant's headaches and narcolepsy were responding to treatment" and "do not reflect that the claimant would have needed to be off task for more than 10% of the workday in addition to

regularly scheduled breaks on a regular basis, as a result of even a combination of the claimant's alleged impairments." (Tr. 10.)  While the ALJ attempted to obtain an opinion on the Plaintiff's RFC from Dr. Boris Chernobilsky, who treated Plaintiff for his narcolepsy in New York before he moved to Connecticut, the ALJ noted that he was unsuccessful in doing so. (Tr. 10.)  The ALJ did consider and give some weight to the opinion of Dr. Sergey Zasypayko, who treated the Plaintiff's narcolepsy more recently; he attributed great weight to Dr. Zasypayko's opinion that the Plaintiff's narcolepsy and cataplexy had worsened since 2016. (Tr. 11.)

The ALJ's findings are supported by substantial evidence in the record.  In August 2012, Plaintiff visited an internist in New York whose notes indicate that Plaintiff requested a sleep study due to his narcolepsy symptoms, which Plaintiff described himself as experiencing since the age of 15. (Tr. 546; *see also* Tr. 558.)  In a medical consultation undertaken in connection with the Plaintiff's disability application in September 2012, the Plaintiff indicated that he took no medications for his narcolepsy. (Tr. 506.)  The subsequent MSLT performed by Dr. Chernobilsky in November 2012 yielded an abnormal result, indicating "[p]robable narcolepsy" that "should be treated appropriately." (Tr. 523.)  A nocturnal polysomnogram conducted the day prior found "no evidence of obstructive sleep apnea or sleep disordered breathing" but the corresponding report reaffirmed the likely narcolepsy diagnosis, referring to the MSLT report. (Tr. 526.)

Following this sleep study, the Plaintiff underwent treatment for his narcolepsy with Dr. Chernobilsky.  The notes from Plaintiff's follow-up visits during this period reflect that different medications were prescribed and adjusted to accommodate the Plaintiff's side effects and symptoms, which tended to ebb and flow.  For example, Plaintiff was initially prescribed Nuvigil in November 2012 (Tr. 545), which Dr. Chernobilsky's notes from April 12, 2013 indicate that he instructed the Plaintiff to stop taking after it interfered with his sleep. (Tr. 549.)  Dr. Chernobilsky

then prescribed a new treatment regimen consisting of Sodium Oxybate Solution, Ritalin, and Xyrem. (Tr. 549.) Approximately one month later, Dr. Chernobilsky reported that Plaintiff's "[h]eadaches have resolved with stopping nuvigil," that he was "[d]oing very well with ritalin ER and IR" and was "[a]lert" but "[s]till having cataplexy with episodes of frustration, body gets weak for 20 seconds." (Tr. 551.) In July 2013, Dr. Chernobilsky reported that Plaintiff was "doing well on medicines except for mild blurred vision which he attributes to the ritalin," and had some "[n]ew issues with short term memory." (Tr. 552.) Dr. Chernobilsky also noted that Plaintiff was experiencing "much less" cataplexy, except for an incident the week prior when his cousin made him angry. (Tr. 552.) In August 2013, Dr. Chernobilsky reported that Plaintiff was "[d]oing well on present regimen" and "feeling better overall," with "[l]ess cataplexy although had trigger seeing new neurologist which was unpleasant but less overall." (Tr. 556.)

While in November 2013 Dr. Chernobilsky noted that Plaintiff "had been doing well on Xyrem until 1 month ago" and that his "cataplexy is worsening, getting more somnolent and states ritalin is not helping him as much anymore" (Tr. 563), by March 2014 Dr. Chernobilsky reported that Plaintiff was "doing well on medicine regimen of xyrem and ritalin." (Tr. 565.) Dr. Chernobilsky further noted that Plaintiff was "[a]ble to function well during day" and "[s]leeps through most of night." (Tr. 565.) In June 2014 Dr. Chernobilsky indicated that Plaintiff was "still feeling somewhat drowsy during day without ritalin but is doing much better from sleep maintenance standpoint," "[c]omplains of some memory loss, complaining of sleep intruding into wakefulness and vice versa at times," and reported "[l]ess cataplectic events but also staying calmer." (Tr. 579.) In July 2014 Plaintiff indicated that his cataplexy had worsened (Tr. 931), while in October 2014 Dr. Chernobilsky described Plaintiff as a "relatively well controlled narcoleptic except for recent increased cataplexy due to high stress in dosmetic[sic] environment."

9

(Tr. 927.)  The October 2014 notes also state, "Move out of present environment if possible."  (Tr. 927.)

By January 2015, Plaintiff was planning to move from Brooklyn to Connecticut and Dr. Chernobilsky noted that Plaintiff's cataplexy was worse in Brooklyn but "[c]ompletely well controlled when in CT."  (Tr. 925.)  In July 2015, Dr. Chernobilsky's notes reflect that Plaintiff was "[a]lert and oriented," had "no cataplexy," and was "[n]ot too sleepy during day . . . Only problem is cluster headaches restarting."  (Tr. 919.)  Plaintiff eventually transferred his care to Dr. Zasypayko in Connecticut, who noted upon an initial evaluation of Plaintiff in December 2015 (approximately one month before the date that the ALJ determined the Plaintiff became disabled) that the Plaintiff's attacks of cataplexy and somnolence had become more frequent.  (Tr. 972.)  Dr. Zasypayko ordered a polysomnogram and MSLT to reevaluate the Plaintiff's condition (Tr. 973), which was conducted on January 7–8, 2016.  (Tr. 967.)  That study yielded an impression of "Benign Snoring and Narcolepsy with Cataplexy."  (Tr. 975.)  Dr. Zasypayko later wrote, in December 2018, that during the subsequent three years that he treated the Plaintiff, he "noted significant worsening of patient condition," including "persistent excessive daytime sleepiness, significant difficulties with concertation[sic], and memory changes due to nature of his medical condition," as well as "frequent cataplexy attack."  (Tr. 1115.)

The ALJ's assessment that Plaintiff's "treatment notes from November 30, 2012, when he was diagnosed with narcolepsy, through the end of 2015, reflect the claimant's headaches and narcolepsy were responding to treatment" (Tr. 10) is thus supported by substantial evidence in the medical record.  The record evidence as a whole suggests that the intensity and frequency of Plaintiff's symptoms of narcolepsy, cataplexy, and headaches varied throughout this period, but that Plaintiff frequently responded well to his medication regimen.  Plaintiff does not identify any

10

evidence that the ALJ overlooked that suggested Plaintiff would have been off-task more than 10%
of the time, as he was after January 1, 2016, or that he otherwise suffered from greater limitations
during this period, other than to argue that the ALJ did not adequately consider the alleged
similarities between the two sleep studies conducted in 2012 and 2016.  However, the ALJ did
evaluate both sleep studies—noting that the 2016 study showed an onset of sleep much quicker
than the onset of sleep in the 2012 study.  (Tr. 12.)   Indeed, the results of the nocturnal
polysomnogram performed in 2012 indicated that "[s]leep onset occurred within 30 minutes of
initiating the recording, which is delayed," (Tr. 526) while the 2016 study revealed a sleep onset
of one minute from initiation of the recording. (Tr. 967.)   Moreover, Plaintiff's "[t]otal sleep
efficiency was reduced to 79.2%," according to the 2016 study (Tr. 967), whereas in 2012 his total
sleep efficiency was 85%.  (Tr. 526.)

While Plaintiff summarily asserts that the Commissioner has overlooked the facts
presented in connection with his disability claim (*see* Pl.'s Reply at 2, ECF No. 23), as noted
previously the ALJ is entitled to resolve conflicting evidence, *see Cage*, 692 F.3d at 122, and this
Court can only reject the Commissioner's findings of fact "if a reasonable factfinder would *have
to conclude otherwise*," *Brault*, 683 F.3d at 448 (quotation marks and citation omitted).  At Step
Four, moreover, "the Plaintiff has the burden to prove a more restrictive RFC than the ALJ found."
*Salerno*, 2020 WL 882006, at *10.  The Court is unable to conclude from the present record that a
reasonable fact finder would "have to" render a determination contrary to that reached by the ALJ.
Nor has the Plaintiff met his burden of proving a more restrictive RFC when the ALJ's decision is
supported by substantial evidence and the Plaintiff has failed to identify any specific evidence that
the ALJ failed to consider that bears on the Plaintiff's functional limitations.

11

**Conclusion**

For the foregoing reasons, the Plaintiff's motion to reverse is denied and the Commissioner's motion to affirm is granted.  The Clerk of the Court is directed to close this case.

**SO ORDERED** at Bridgeport, Connecticut, this 23rd day of July 2020.

 */s/ Kari A. Dooley*
KARI A. DOOLEY
UNITED STATES DISTRICT JUDGE